UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| J.P. MORGAN SECURITIES LLC, | ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| GEORGE A. RIZOS and | ) | |
| JOSEPH A. VITALE, | ) | |
| | ) | |
| Defendants. | ) | |

COMPLAINT
(INJUNCTIVE RELIEF SOUGHT)

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against Defendants George A. Rizos ("Rizos") and Joseph A. Vitale ("Vitale") (collectively, "Defendants"):

Preliminary Statement

1.     This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendants that concurrently is being filed with FINRA Dispute Resolution.[1]

2.     This dispute arises out of Defendants' departures from JPMorgan on June 30, 2017, and the immediate commencement of their employment with Wayne Hummer Investments L.L.C., doing business as Wintrust Wealth Management ("Wintrust"), a competitor

---

[1] The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange. JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes. A true and correct copy of Rule 13804 is annexed to the accompanying Declaration of Leonard Weintraub.

of JPMorgan. At the time of their resignations, Defendants were Private Client Advisors in JPMorgan's Chase Wealth Management branch office in Prospect Heights, Illinois.

3. Both Rizos and Vitale have engaged in improper conduct after resigning from JPMorgan, in violation of their agreements with JPMorgan.

4. JPMorgan has learned that since resigning from JPMorgan and joining Wintrust, Defendants are aggressively soliciting JPMorgan clients to move their accounts from JPMorgan to them at Wintrust.

5. Based on information and belief, Defendants and/or Wintrust sent out a mailing announcing that Defendants have joined Wintrust. Numerous JPMorgan clients provided the announcements that they received. A copy of this announcement is annexed to the Declaration of Tony F. Haeussler ("Haeussler Decl.") as Exhibit A. In addition to the sending of this announcement, JPMorgan also is aware that Defendants and/or Wintrust have placed an advertisement in a newspaper in Arlington Heights, Illinois announcing that Defendants have joined Wintrust.

6. Notwithstanding the fact that Defendants sent an announcement notice and placed an ad in a local newspaper, numerous JPMorgan clients also have reported that Defendants have been calling them not only announcing – again – their new employment, but requesting meetings with such clients to discuss doing business with them at Wintrust. JPMorgan has spoken with a significant number of the JPMorgan clients whom Defendants formerly serviced, at least two dozen of whom informed JPMorgan that Defendants have contacted them about doing business at Wintrust. The clients have informed the firm that Defendants are requesting meetings with the clients and actively seeking to have them do business with them at Wintrust.

7.      At least a dozen JPMorgan clients have informed the firm that Rizos is telling them that he would like to have the clients come in to Wintrust's offices so that Rizos can talk to the clients about moving their accounts from JPMorgan to Wintrust.  One JPMorgan client told the firm that Rizos has reached out to her more since he joined Wintrust than during the entire time he was employed by JPMorgan.

8.      Similarly, at least a dozen JPMorgan clients have informed the firm that Vitale is calling them seeking to set up meetings with the clients to discuss transferring their accounts to him at Wintrust, and also requesting that the clients bring copies of their JPMorgan account statements with them to the meeting so he can tell the clients "what we can do for you" at Wintrust.

9.      Unfortunately, it appears that Defendants' improper solicitation efforts have proved successful, as approximately 55 JPMorgan clients, with assets totaling in excess of $36 million, already have transferred their accounts to Defendants at Wintrust.

10.      At the time he left JPMorgan, Rizos serviced approximately 700 JPMorgan clients/households, virtually all of which were either pre-existing JPMorgan clients at the time they were assigned to Rizos, or were developed by Rizos at JPMorgan.  The clients whom JPMorgan had assigned to Rizos to service had a total of approximately $180 million in total assets under management.  Rizos now seeks to improperly induce such JPMorgan clients to follow him to Wintrust.

11.      At the time he left JPMorgan, Vitale serviced approximately 300 JPMorgan clients/households, virtually all of which were either pre-existing JPMorgan clients at the time they were assigned to Vitale, or were developed by Vitale at JPMorgan.  The clients whom JPMorgan had assigned to Vitale to service had a total of approximately $119 million in

total assets under management. Vitale now seeks to improperly induce such JPMorgan clients to follow him to Wintrust.

12. Defendants' conduct constitutes a breach of their employment agreements (which contain non-solicitation provisions), JPMorgan's Code of Conduct (which they agreed to abide by), and a violation of their common-law obligations to JPMorgan

13. To prevent continued irreparable harm arising from Defendants' course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendants from soliciting JPMorgan's clients, and barring Defendants from using JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claims against them in a related arbitration that JPMorgan also is in the process of commencing.

## Jurisdiction and Venue

14. The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiffs JPMorgan, on the one hand, and Defendants, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in Prospect Heights and Arlington Heights, Illinois.

## The Parties

16. Plaintiff JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York. The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware

corporation with its principal place of business in New York, New York. JPMorgan is a member firm of FINRA. Defendants maintains securities licenses through FINRA.

17.    JPMorgan provides traditional banking, investment, trust and estate services in the Chicago area through its Chase Wealth Management branch offices. Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management and Chase Bank branch employees adopt a team approach to service a wide variety of JPMorgan clients' investment and banking needs.

18.    Defendants are individuals who at all times relevant herein were employed and/or conducted business in Prospect Heights and/or Arlington Heights, Illinois and were and are citizens of Illinois. Defendants also are registered representatives currently employed by Wintrust in its Arlington Heights, Illinois office. Defendants were previously employed by JPMorgan in its Prospect Heights, Illinois branch office.

19.    In connection with their status as registered representatives of JPMorgan, Defendants each executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer. By executing the Form U-4, Defendants agreed to submit to arbitration disputes, claims and controversies arising between themselves and JPMorgan.

## Factual Allegations

20.    Rizos has been employed by JPMorgan or its predecessors since 1999, when he started as a Bank Teller for Bank One Corporation. In or around August 2002, Rizos was promoted to a Relationship Banker with Bank One Corporation and entered into an employment agreement which contains provisions prohibiting him from soliciting the firm's clients for a one year period after the termination of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client

information (the "Rizos Bank One Non-Solicitation Agreement"). A true and accurate copy the Rizos Bank One Non-Solicitation Agreement is annexed top the Haeussler Decl. as <u>Exhibit B</u>. In July 2004, Bank One Corporation merged with JPMorgan Chase & Co., the parent company of Claimant, and Rizos became an employee of Chase Investment Services Corp. ("Chase Investment"), then a registered broker-dealer, and an affiliate of JPMorgan. Effective October 1, 2012, Chase Investment merged with and into JPMorgan, with JPMorgan being the surviving legal entity.

21.     In or about February 2012, Rizos was promoted to a Private Client Advisor and entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement with JPMorgan (the "Rizos Non-Solicitation Agreement"). A true and accurate copy of the Rizos Non-Solicitation Agreement is annexed to the Haeussler Decl. as <u>Exhibit C</u>. The Rizos Non-Solicitation Agreement also contains provisions prohibiting Rizos from soliciting JPMorgan clients for a period of one year after the termination of his employment and requiring him to maintain the confidentiality of the JPMorgan's confidential and proprietary business and client information.

22.     Vitale commenced employment with JPMorgan or its predecessors in or about June 2006 and entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement, dated June 5, 2006 (the "2006 Vitale Non-Solicitation Agreement"), that contains provisions prohibiting him from soliciting the firm's clients for a one year period after the termination of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information. A true and accurate copy of the 2006 Vitale Non-Solicitation Agreement is annexed to the Haeussler Decl. as <u>Exhibit D</u>.

23.     In or about February 2012, Vitale was promoted to a Private Client Advisor and entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement with JPMorgan (the "Vitale Non-Solicitation Agreement").  A true and accurate copy of the Vitale Non-Solicitation Agreement is annexed to the Haeussler Decl. as <u>Exhibit E</u>.  The Vitale Non-Solicitation Agreement also contains provisions prohibiting Vitale from soliciting JPMorgan clients for a period of one year after the termination of his employment and requiring him to maintain the confidentiality of the JPMorgan's confidential and proprietary business and client information.

24.     At the time of their resignations, Rizos and Vitale were both Private Client Advisors.  JPMorgan Chase Bank, N.A. ("Chase Bank"), an affiliate of JPMorgan,[2] referred its bank clients to Defendants, in their capacity as Private Client Advisors for Chase Wealth Management, in order for them to build JPMorgan's relationship with such clients.  Defendants sat at their desks at a Chase Bank branch and were introduced to hundreds of existing bank customers (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management.  As Private Client Advisors, Defendants were not expected to engage in cold calling or to build a client base independent of referrals from JPMorgan.  Virtually all of the clients Defendants serviced at JPMorgan were assigned or referred to them by JPMorgan.

25.     As indicated above, JPMorgan gave Defendants virtually all of the clients they were servicing at the time of their resignation.  These clients assigned to Defendants were pre-existing JPMorgan clients who were reassigned to Defendants, were long-term Chase Bank

---

[2]     For convenience, JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC sometimes collectively are referred to herein as JPMorgan.

clients who were referred to Defendants, or were developed by JPMorgan at the time they were assigned to Defendants.

26.     JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years.  It is with great difficultly, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients, and JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Private Client Advisor or other team members resign or leave JPMorgan.  But for their employment with JPMorgan, Defendants would not have had any contact with virtually any of the clients the firm assigned or referred to them and whom they are now soliciting.

27.     As part of their official duties at JPMorgan, Defendants had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment, trust and estate needs.  As explained in further detail below, such information – which is not publicly available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor such as Wintrust.

**Defendants' Employment Agreements and Obligations to JPMorgan**

28.     As noted above, Defendants each entered into multiple agreements with JPMorgan or its predecessors during their employment that contain non-solicitation and confidentiality provisions.

29.     The Rizos Non-Solicitation Agreement and the Vitale Non-Solicitation Agreement that they entered into with JPMorgan in 2012 are nearly identical in all material respects and are collectively referred to herein as the "Non-Solicitation Agreements."

30.     Section 7(a) of the Non-Solicitation Agreements, entitled "Confidential Information," provides, in relevant part, that:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.* (Exhibits C and E to the Haeussler Decl.)

31.     Section 7(b) of the Non-Solicitation Agreements provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

> i.  *names, addresses and telephone numbers of customers and prospective customers;*
>
> ii.  *account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*
>
> iii.  *specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*
>
> \*     \*     \*
>
> vi. *all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*
>
> \*     \*     \*
>
> viii. *information concerning established business relationships;*
>
> ix. *"trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of*

*Confidential Information specifically described in this Section.* (Exhibits C and E to the Haeussler Decl.)

32.     In Section 7(c) of the Non-Solicitation Agreements, Defendants again expressly acknowledge that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

33.     In Sections 7(d) and 7(e) of the Non-Solicitation Agreements, Defendants agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third party, and to return all JPMorgan Confidential Information upon the termination of their employment.

34.     In Section 8 of the Non-Solicitation Agreements, Defendants agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

    a.  *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein,* **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.**

    b.  *You understand and agree that JPMC has developed and uses a unique business model for the offering of investment and bank products and services, including without limitation the Chase Wealth Management and the Chase Private Client platforms. Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing*

*investment relationships with JPMS and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A. Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC. The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill, reputation, name recognition, Confidential Information, specialized training, mentoring and expenditures made by JPMC. This platform and relationship model developed by JPMC is special and unique to JPMC, providing you and JPMC with a unique opportunity to service and interact with clients and customers in ways not known or available to competitors. You acknowledge that by utilizing the platforms, you will be given access to confidential information and/or trade secrets, which are not readily available through any public sources and the protection of which represent a legitimate business interest of JPMC.*

c.   *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.* (Exhibits C and E to the Haeussler Decl.) (emphasis added)

35.    Rizos had no prior industry experience before joining JPMorgan or its predecessors.  Although Vitale had some industry experience before joining JPMorgan, he had been out of the brokerage business for approximately four years before joining JPMorgan in 2006.  Only a handful of clients (approximately 10 or less) that Vitale serviced at JPMorgan had been serviced by Vitale at one of his former firms.  Moreover, the "Attachment A" to the Non-Solicitation Agreements, which Defendants each signed, is blank in the section for listing pre-existing relationships that they are bringing with them to JPMorgan, which is consistent with JPMorgan's understanding that they brought no clients (or only a handful, in Vitale's case) with them to JPMorgan.

36. In Section 10(a) of the Non-Solicitation Agreements, Defendants agreed that the above-referenced provisions are reasonable, and that they voluntarily entered into the agreement after having had an opportunity to review it with their counsel:

> i. *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*
>
> ii. *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*
>
> iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving compensation associated with non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.* (Exhibits C and E to the Haeussler Decl.)

37. In addition, in Section 10(b) of the Non-Solicitation Agreements, Defendants acknowledge that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreements.

38.     Additionally, in Section 3(b) of the Non-Solicitation Agreements, Defendants agreed to adhere to JPMorgan's Code of Conduct, as amended from time to time.

39.     Defendants were provided with JPMorgan's Code of Conduct, which was made available to all employees, as it was updated from time to time.  Section 3.6 of JPMorgan's Code of Conduct, entitled "Leaving JPMorgan Chase," provides, in relevant part:

> As a condition of working for [JPMorgan], there are certain responsibilities you will have as you leave our Company and as your employment with our Company ends, including:
>
> • *Returning all Company assets in your possession*
>
> • *Maintaining the confidentiality of information, not only of [JPMorgan] but of those individuals and companies that do business with [JPMorgan]; this does not prevent you from reporting to the government or regulators conduct that you believe to be in violation of law*
>
> *Certain senior employees have additional obligations for one year after they leave [JPMorgan] including prohibitions in soliciting and hiring JPMorgan Chase employees or soliciting certain customers.  Some employees are subject to other post-employment restrictions.  You have a responsibility to known and comply with the requirements that apply to you.  Consult with your Human Resources Business Partner if you have any questions.*

A true and correct copy of relevant sections of JPMorgan's Code of Conduct, including Section 3.6, and the related policy link entitled "Responsibilities of Former Employees," is attached to the Haeussler Decl. as Exhibit F.

40.     As set forth in Section 1.2 of JPMorgan's Code of Conduct, all JPMorgan employees are required to affirm, either in writing or electronically, that they have read and understood the Code and that they will comply with it.  Section 1.2 provides, in relevant part:

> *Each of us has a responsibility to uphold the Code; in fact, compliance with the Code is a term and condition of employment with the Company. This means you must know the Code, you must do the right thing when it comes to your own conduct, and you must speak up about conduct by others that might violate our Code or Company policies . . .*

> *Prior to joining the Company, new hires are required to provide an affirmation that they have read and understand the Code, will comply with it and will report suspected violations as required by the Code. New hires must complete Code training shortly after they begin work. All employees are required to complete additional Code training and provide a new affirmation periodically, usually annually. Compliance with these requirements is a condition of employment.* (<u>Exhibit F</u> to the Haeussler Decl.)

41.     Each year, Defendants annually affirmed electronically their agreement to comply with the Code of Conduct. A true and correct copy of Defendants' affirmations to adhere to the Code of Conduct for the most recent acknowledge cycle is annexed to the Haeussler Decl. as <u>Exhibit G</u>.

42.     As referenced in Section 3.6 of the Code of Conduct, Defendants also had additional responsibilities to JPMorgan because they were considered Senior-Level Employees (as defined in the "Responsibilities of Former Employees") under JPMorgan's Code of Conduct. Defendants' additional responsibilities include a one year prohibition on the solicitation of clients, as set forth in Section 5.3 of the "Responsibilities of Former Employees":

> *The Company considers its customer and supplier relationships, as well as its relationships with is employees, officers, and contractors, important and valuable assets. Accordingly, as a condition of your employment or continued employment, if you are a Senior-Level Employee (as defined in Defined Terms, section 10 of this Policy), then **for a period of one year after your employment with JPMorgan Chase terminates, you are not permitted to, directly or indirectly**, on your own behalf or that of any other party, without the prior written consent of the Director of Human Resources of JPMorgan Chase:*
>
> $$* \qquad\qquad * \qquad\qquad *$$
>
> •     *solicit, encourage, induce or attempt to induce to leave the Company, or divert or attempt to divert from doing business with the Company, any then current customers, suppliers, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with the Company, or otherwise interfere with the relationship between the Company and such customers, suppliers, and other persons or entities. This does not apply to publicly known institutional customers that you service after your employment with the*

*Company terminates without the use of the Company's confidential or proprietary information.* (<u>Exhibit F</u> to the Haeussler Decl.) (emphasis added)

43.     JPMorgan's "Responsibilities of Former Employees" policy link further provides in Section 5.1, in relevant part:

> *When you leave JPMorgan Chase, you are not permitted to use any Company assets or access its systems or buildings. You must also turn over to the Company, in good condition, all assets of the Company that are in your possession or control (or come into your possession or control in the future), including but, not limited to:*
>
> \*                    \*                    \*
>
> *All Confidential Information, whether maintained electronically or otherwise, including information on mobile or remote computers, such as desktop PCs, laptops, personal digital assistants, pagers, cell phones and all other wireless devices, whether you own the devices or the devices belong to the Company and are used at locations other than a JPMorgan Chase place of business.*
>
> *You are not permitted to duplicate or remove from JPMorgan Chase's premises, or directly or indirectly access, use or disclose to anyone, any Confidential Information. (For a description and additional examples of Confidential Information, refer to section 7 of this Policy and section 1.4 – Dealing with Confidential Information in the Company's Code of Conduct)* (<u>Exhibit F</u> to the Haeussler Decl.)

44.     In consideration for entering into an employment relationship with JPMorgan and entering into the agreements discussed above, Defendants were provided with significant benefits, including substantial compensation, office and support facilities, underwriting, research, brokerage operations and health insurance.

### **JPMorgan's Confidential Information**

45.     During the course of their employment by JPMorgan, Defendants had access to highly confidential JPMorgan client information in addition to other financial, trust and estate information that is confidential and proprietary to JPMorgan. JPMorgan's client files contain confidential financial information regarding each client, including client identity,

address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data. Defendants had no interaction with virtually all of the clients they serviced at JPMorgan (and no knowledge of any of their confidential information) until they started working at JPMorgan or its predecessors.  As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

46.     A critical factor to JPMorgan's continued success is its relations with its clients and advisors.  JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill.  JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendants, for them to use to obtain and build relationships with its clients.

47.     JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients.  JPMorgan has invested substantial corporate resources to develop and maintain its client information.  Virtually every JPMorgan client that Defendants serviced was developed by JPMorgan at great expense and over a number of years.  JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

48.     JPMorgan has also expended significant resources to service its clients, virtually all of whom were assigned or referred to Defendants by JPMorgan.  These resources

include millions of dollars a year JPMorgan spends for sales support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services. JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendants.

49.     Employees such as Defendants must maintain client information as strictly confidential. These instructions are confirmed in the various agreements and policy manual provisions referenced above.

50.     Unless Defendants' misconduct is immediately restrained and enjoined, other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

51.     Defendants' misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, tortious interference, and unfair competition. Unless Defendants' conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct. This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

52.     By improperly soliciting JPMorgan's clients, Defendants have caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages. Defendants' wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

(a) Loss of JPMorgan clients and loss of clients' confidence;

(b) Injury to JPMorgan's reputation and goodwill in Illinois;

(c) Loss of JPMorgan employees, damage to office morale and stability, and the undermining of office protocols and procedures; and

(d) Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

53. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 52 hereof.

54. Defendants breached their contracts and agreements with JPMorgan by soliciting JPMorgan's clients. By soliciting JPMorgan's clients, Defendants seek to convert to their benefit JPMorgan's protectable interests.

55. As a direct and proximate result of Defendants' breaches of their contracts, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

56. JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 55 hereof.

57. As employees of JPMorgan, Defendants owed JPMorgan a fiduciary duty of trust and loyalty.

58. Defendants' fiduciary duties required them at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's trade

secrets and other confidential and proprietary business and customer information. Defendants'
fiduciary duties required them at all times to refrain from, among other things, soliciting
JPMorgan's clients to join them at a competing company.

59.     Defendants breached their fiduciary duty to JPMorgan by engaging in the
conduct alleged above. Defendant engaged in such wrongdoing upon their resignation from
JPMorgan and joining JPMorgan's competitor, Wintrust.

60.     As a direct and proximate result of Defendants' breaches of their fiduciary
duties, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from
which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining
order and a preliminary injunction.

## THIRD CAUSE OF ACTION
### (Intentional Interference with Actual
### and Prospective Economic Advantages)

61.     JPMorgan realleges and incorporates herein by reference the allegations of
paragraphs 1 through 60 hereof.

62.     JPMorgan has developed and maintains advantageous actual and
prospective business relationships with its clients that promise a continuing probability of future
economic benefit to JPMorgan.

63.     JPMorgan is informed and believes, and on that basis alleges, that
Defendants knew or reasonably should have known about JPMorgan's advantageous actual and
prospective business relationships with its clients.

64.     JPMorgan is informed and believes, and on that basis alleges, that
Defendants have intentionally, maliciously and improperly interfered with and continue to
interfere with JPMorgan's relationships with its clients by, among other things, directly and/or

indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with their new employer.

65. There was no privilege or justification for Defendants' conduct. Moreover, Defendants' actions also constitute wrongful conduct above and beyond the act of interference itself, including breach of contract, unfair competition, and breach of their fiduciary duties.

66. Defendants' conduct was willful and malicious.

67. As a direct and proximate result of Defendants' tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**FOURTH CAUSE OF ACTION**
**(Negligent Interference with Actual and**
**Prospective Economic Advantages)**

68. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 67 hereof.

69. JPMorgan entrusted Defendants with confidential information for use solely in performing their duties as employees of JPMorgan. As employees of JPMorgan, Defendants occupied a position of great trust and confidence. Defendants thereby owed JPMorgan a fiduciary duty to deal with JPMorgan in good faith and with loyalty. Defendants also were obligated to use due care so as not to interfere with JPMorgan's business relationships, including those with its clients.

70. Defendants, in breach of their duty of due care, have attempted to induce JPMorgan clients to leave JPMorgan.

71.     JPMorgan is informed and believes, and on that basis alleges, that Defendants were fully aware that their failure to use ordinary care could subject JPMorgan to lose clients.

72.     As a direct and proximate result of Defendants' negligent interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### FIFTH CAUSE OF ACTION
**(Unfair Competition)**

73.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 72 hereof.

74.     Defendants' conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

75.     As a direct and proximate result of the Defendants' unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, JPMorgan respectfully requests that a judgment be entered in its favor against Defendants as follows:

A.     In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award in the underlying dispute, enjoining and restraining Defendants, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees and/or agents of Wintrust, from:

(a) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan customer serviced by Defendants at JPMorgan or whose names became known to Defendants by virtue of their employment with JPMorgan (or any of its predecessors in interest); and

(b) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.      Ordering Defendants, and all those acting in concert with them, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's customers, employees and business, within 24 hours of notice to Defendants or their counsel of the terms of such an order.

C.      Such other and further relief as the Court deems just and proper.

Dated:  July 21, 2017

Respectfully submitted,

**J.P. MORGAN SECURITIES LLC**

By:  _/s/ Jenny Goltz_____
         *One of Its Attorneys*

Anneliese Wermuth (#6270970)
*awermuth@cozen.com*
Jenny Goltz (#6290036)
*jgoltz@cozen.com*
Cozen O'Connor
123 N. Wacker Drive
Suite 1800
Chicago, Illinois 60606